BRACKEN, Respondent, v. BRACKEN, Appellant.

(187 N. W. 46.)

(File No. 4974.   Opinion filed April 26, 1922.) ·

1. **Marriage and Divorce—Common Law Marriages, Whether Existent in This State—Requisites Of—Adulterous Intercourse as Insufficient.**

Common law marriages may exist under the law of this state; following Svendsen v. Svendsen, 37 S. D. 353; but there must be an understanding in the present tense that the parties are husband and wife; they must at once and in good faith assume the marriage relation with intent to continue so during remainder of their lives, and must believe and understand that they are in fact and in law husband and wife. Illicit or adulterous intercourse, even with intent to become legally married at some future time, is insufficient.

2. **Same—Previous Illicit Co-habitation With Other Men, Subsequent Relations With Another, Representations Re As Husband and Wife, Subsequent Cohabitation With Previously Married Defendant With Promise of Marriage, Without Disclosing They Were "Breaking the Law"— Defendant's Subsequent Divorce From Legal Wife, Effect—Whether Constituting Common Law Marriage.**

Where plaintiff, in a suit for divorce, testified she had married one K, who subsequently died, she thereafter marrying one R at a date she was unable to give and with whom she lived but a short time, she later learning after he had gone elsewhere that he was dead, whereupon she began living with one L, who wanted to marry her but she refused though continuing to live with him, they representing themselves as husband and

wife, such association continuing for about five and one-half years, when she met defendant, with whom a few days thereafter she started for F to get married, he having asked her to marry him to which she agreed, he however having told her he had a wife but was expecting a divorce when he reached F; that while no divorce came they immediately commenced to live together as husband and wife, until some four months later, they frequently talking of getting married when they could do so without letting their friends know they had been "breaking the law;" defendant, a veterinary surgeon, having traveled about from place to place as a state official, she testifying the real reason they did not marry being they could not do so without exposing themselves to friends and showing them "we had broken the law;" that defendant's legal wife secured a divorce from him some three years after said association began, yet that they did not get married, nor consider themselves married after said decree was granted; **held,** such cohabitation between plaintiff and defendant did not constitute a common law marriage; the parties having lived together in open adultery, she not being deceived nor imposed upon; that such cohabitation however long continued, does not constitute marriage; cohabitation, illicit in the beginning, being presumed to be such to the end. So **held,** in view of her further testimony that about the date of said decree of divorce plaintiff and defendant entered into an agreement that cohabitation between them should cease, which agreement was "religiously kept up to the present time;" she testifying "we looked at it from a practical standpoint and decided to eliminate any scandal there might be by continuing to live as man and wife to the end. I wanted to leave him at that time and he wouldn't let me." Defendant testified that neither had any intention of getting married or had any object in view other than mutual comfort derived from each other's society.

**3.  Real Property—Household Goods—Purchase Of, Whether With Joint Accumulations of Alleged Husband and Wife—Sufficiency of Evidence.**

    A finding, in a suit for divorce, that the funds used in purchase of realty were the joint accumulation of the parties, will not be disturbed on appeal, where evidence is so conflicting it is difficult to determine where the truth lies; and same is true concerning household goods and furniture shipped to the home of plaintiff; and the portions of judgment appealed from concerning title to the land and relating to the personalty as awarded to each party are affirmed.

Appeal from Circuit Court, Meade County. Hon. JAMES McNENNY, Judge.

Action by Cecelia A. Bracken, against William J. Bracken, for a decree of divorce, for permanent alimony for plaintiff's support, and for a decree that title to certain real and personal property alleged to have been purchased with her money be quieted in her name, for an accounting of proceeds of the land, and for other relief. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed in part and reversed in part.

*Williams & Sweet,* for Appellant.

*John T. Milek,* for Respondent.

(1)  To point one of the opinion, Appellant cited: Henry et al., v. Taylor, 16 S. D. 433.

(2)  To point two, Appellant cited: Secs. 105, 102, Code 1919; Svendsen v. Svendsen, et al., 37 S. D. 353.

POLLEY, J. In this action plaintiff seeks: First, a decree of divorce from defendant; second, permanent alimony sufficient to support her during the remainder of her life; third, that title to certain real and personal property alleged to have been purchased with her money be quieted in her name; and, fourth, for an accounting of the proceeds of said land together with certain personal property alleged to have been purchased with the proceeds of said land.

In his answer defendant denies that plaintiff and defendant were ever married, denies that she purchased or contributed to the purchase of the real property involved or that she ever had any interest in or right to the same or to any of the personal property involved, and alleges that all of said property was acquired by defendant by and through his own individual means and effort.

Plaintiff does not claim that any marriage between her and defendant was ever solemnized in any manner or that any marriage license was ever procured, but that a so-called "common-law" marriage did exist. This marriage is alleged to have taken place during the month of July, 1905; and the court found as a fact that during the month of July, 1905, plaintiff and defendant entered into the relation of husband and wife, and that ever since said date they had held themselves out to the world as husband and wife. The court also found that prior to and at the time plaintiff and defendant entered into the said claimed marriage

relation, and thereafter until the month of July, 1908, defendant had a wife living, to whom he was legally married, but that during said month this impediment was removed, and that plaintiff and defendant then mutually resumed and continued their marriage relations and held themselves out as husband and wife and have so conducted themselves as to give undivided repute that they were husband and wife. Defendant challenges the sufficiency of the evidence to support this finding.

[1] Whether common-law marriages can exist under the law of this state was discussed by this court at great length in Svendsen v. Svendsen, 37 S. D. 353, 158 N. W. 410, and decided in the affirmative.

But certain requisites are necessary to constitute such marriages. There must be an understanding in the present tense that the parties are husband and wife; they must at once, and in good faith, assume the marriage relation with the intent to continue the same during the remainder of their lives. Both parties must in good faith believe and understand that they are in fact and in law husband and wife. No mere illicit or adulterous intercourse, even with the intent to become legally married at some future time, is sufficient.

With this rule in view let us examine the facts relative to the alleged marriage of plaintiff and defendant; and for this purpose we shall entirely disregard the testimony of defendant. Plaintiff testified that she had married a man by the name of Kelly in 1890. Kelly died in 1894. Some time thereafter she married a man by the name of Reuting at Rock Island, Ill. She was unable to give the date when she married him; and in fact her marriage with him left so little impression on her mind that at a former trial of this case she had entirely forgotten that she ever had such a husband. She lived with Reuting only a short time, when he went to Alaska, and a year and two months or such a matter thereafter she received word that he was dead. She then went to living with a man by the name of Lecount. She said Lecount wanted to marry her, but she refused; said she had had enough of marriages. But she continued to live with him, and they represented themselves to others as husband and wife. He introduced her as his wife and she introduced him as her husband. They were both engaged as traveling salesmen, though

28—Vol. 45, S. D.

just what they were selling is not clear from the record. They were both employed by the same company, and they represented themselves to their employers to be husband and wife. He paid her living and traveling expenses. At one time they visited Lecount's family, where he introduced her as his wife. This association continued from about 1900 until during the month of July, 1905, when plaintiff met defendant. She testified that she met him at the depot in some town in Western Iowa where they were both stopping at the same hotel, and within a very few days thereafter they started for Fargo. She testified that they went there to get married; that defendant asked her to marry him, and that she agreed to do so; that he told her before they went to Fargo that he had a wife, but that he was expecting a divorce when he reached Fargo, and that they would get married as soon as they reached there, The divorce did not come, but, notwithstanding that fact, they immediately commenced to live together as husband and wife; in fact she testified: "We went to Fargo as man and wife; we lived in the hotel."

They lived in this manner until some time the following September, when they went to Glendive, Mont., where they continued to live as they had lived in Fargo until some time in November following, when plaintiff went home to visit her mother in Davenport, Iowa. During the time they were together they frequently talked of getting married when they could do so without letting their friends know they had been "breaking the law." She testified that defendant said that after they reached Glendive they would "take a little run up the line some place and get married where we wouldn't be known."

Plaintiff did not return from Davenport until the 27th day of the following February. In the meantime defendant had been sent to Rapid City. Defendant was a veterinary surgeon in the employ of the government as stock inspector, and was sent about from place to place by the Bureau of Animal Industry to inspect stock. Plaintiff gave as her reason why they did not get married before they left Glendive that they had no opportunity to get married "without exposing ourselves to our friends and showing them we had broken the law." This, she said, was the real reason why they did not get married. Plaintiff returned from Davenport, Iowa, and met defendant at Rapid City on the 27th of

February, 1906, where they resumed and continued their cohabitation until some time during the month of July or 'August, 1908. On the 31st day of July, 1908, defendant's wife secured a decree of divorce from him on the ground of desertion in the circuit court for the county of Genesee, in the state of Michigan. This decree removed the legal impediment to the marriage of plaintiff and defendant, but still they did not get married nor did they consider themselves married any more after this decree of divorce was granted than they did before. They were still talking about getting married, but there was no opportunity to do so without exposing themselves to their friends, and defendant said that—

"The next best thing we could do would be to take a trip to Canada and we could stop off some place along the line and get married; that was the only way he could see out of it where we wouldn't run into people we knew."

They did take a trip to Canada, where they visited defendant's people, and where they represented themselves as husband and wife, but they did not get married.

This kind of cohabitation does not constitute common-law marriage. During all this time up to the 31st of July, 1908, covering a period of three years, plaintiff and defendant lived together in open adultery. She was not deceived nor imposed upon. She knew that cohabitation with defendant was criminal. All the time she said they were intending to get married at the first opportunity they had to do so without exposing themselves to their friends she knew that they could not be legally married under any circumstances. Such cohabitation, however long continued, does not constitute marriage. Cohabitation that is illicit in the beginning is presumed to be illicit to the end. Henry v. Taylor, 16 S. D. 424, 93 N. W. 641; Svendsen v. Svendsen, supra. But there is nothing to indicate that they entered into any renewal of their agreement to be man and wife after the legal impediment was removed. Indeed, they did just the opposite. At just about the date of the decree of divorce plaintiff and defendant entered into an agreement that cohabitation between them should cease, and plaintiff testified that that agreement was "religiously kept * * * up to the present time." They were living in St. Paul at the time this agreement was made, and plaintiff testified:

"We looked at it from a practical standpoint and decided to eliminate any scandal there might be by continuing to live as man and wife to the end. I wanted to leave him at that time, and he wouldn't let me."

[2] Under plaintiff's testimony she was no more married to defendant that she was to Lecount at the time of her first meeting with defendant. But the record fails to show that Lecount had any property; hence no divorce from him was necessary. Defendant denied absolutely that either of them ever had any intention of getting married or had any object in view other than the mutual comfort to be derived from each other's society.

[3] In regard to three quarter sections of the land involved the trial court found:

"That the funds used in the purchase of said lands were the joint accumulations of both the plaintiff and the defendant, and contributed by plaintiff and defendant in equal proportions therefor."

Appellant contends that this finding is not only unsupported by, but is contrary to, all the evidence in the case. The evidence upon this question is so conflicting that it is difficult to determine where the truth lies. Certainly it cannot be said that the finding of the trial court is against the preponderance of the evidence; therefore it will not be disturbed by this court.

The finding and judgment relative to certain household goods and furniture shipped out from Minneapolis by respondent is based on conflicting evidence and will not be disturbed by this court.

The portions of the judgment relating to the title to all the land involved and the portions of the judgment relating to the personal property as awarded to each party are affirmed.

The remaining portions of the judgment are reversed, and as to such portion of the judgment a new trial is awarded.

No costs will be taxed in this court by either party.